**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**BILL LESLIE HOLLYFIELD,**

       **Plaintiff,**

v.                                **Case No.: 2:17-cv-03859**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 17, 18). The undersigned has fully considered the evidence and arguments of counsel. For the reasons that follow, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** Defendant's request to affirm the

1

decision of the Commissioner, (ECF No. 17); and **DISMISS** this action from the docket of the Court.

## I.    Procedural History

On January 22, 2014, Plaintiff Bill Leslie Hollyfield ("Claimant"), completed an application for DIB, alleging a disability onset date of August 24, 2011, due to "Heart attack-9 stints [*sic*] in heart, Shoulder injury-2 operations, Sleeping problem, Anxiety, [and] depression." (Tr. at 186, 200). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 32). Claimant filed a request for an administrative hearing, which was held on September 13, 2016, before the Honorable William R. Paxton, Administrative Law Judge ("ALJ"). (Tr. at 52-76). By written decision dated September 23, 2016, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 32-45). The ALJ's decision became the final decision of the Commissioner on June 26, 2017, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 6, 7, 16). Both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 12, 17, 18). Therefore, the issues are fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 43 years old on his alleged onset date and 48 years old on the date of the ALJ's written decision. (Tr. at 32, 60). He has a college degree in environmental science and communicates in English. (Tr. at 60, 199, 201). In the past, Claimant has worked as a pharmaceutical sales representative and account executive. (Tr. at 62, 201).

### III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant—taking into account his or her age, education, skills, work experience, and physical shortcomings—has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed

4

mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 34, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 24, 2011, his alleged disability onset date. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "coronary artery disease/status post stenting, degenerative disc disease of the cervical spine with cervical radiculopathy, left shoulder degenerative changes/status post left shoulder surgery, headaches, status post thyroidectomy, primary insomnia, attention deficit disorder, and bipolar disorder." (Tr. at 34-35, Finding No. 3). The ALJ also considered Claimant's hypertension, benign prostatic hypertrophy, allergic rhinitis, and asthma, but determined that these impairments were non-severe. (Tr. at 35, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 35-38, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he should never climb ladders, ropes, or scaffolds, as well as never crawl. He is able to climb ramps and stairs, balance, kneel, stoop, and crouch occasionally. He is unable to perform overhead reaching with the non-dominant left upper extremity. He must avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, poor ventilation, vibration, and hazards such as heights and machinery. The claimant is limited to understanding, remembering, and carrying out simple instructions and to performing routine and repetitive

tasks. Work should not be at a rapid pace or involve strict production quotas. He is limited to occasional interactions with the public.

 (Tr. at 38-43, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work (Tr. at 43-44, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 44-45, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the date last insured (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 44, Finding Nos. 7-9). Given these factors and Claimant's RFC, and with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 44-45, Finding No. 10). For instance, Claimant could work as an office/clerical worker or perform security positions at the sedentary exertional level. (*Id*). Accordingly, the ALJ found that Claimant was not disabled under the Social Security Act. (Tr. at 45, Finding No. 11).

## IV.    <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant asserts two challenges to the Commissioner's decision. First, Claimant contends that the ALJ erred by not finding that Claimant met the criteria of Listing 12.04C(2). Claimant argues that his treating psychiatrist, Dr. Alexander Otellin, opined that Claimant met Listing 12.04C(2), yet the ALJ disregarded the opinion without good reason; in effect, the ALJ simply substituted his own judgment for that of a trained professional. (ECF No. 12 at 8-12). Consequently, the ALJ's decision was not supported

by substantial evidence.

In his second, and related challenge, Claimant alleges that the ALJ failed to follow Social Security regulations and rulings in the manner in which he weighed Dr. Otellin's opinions. Claimant states that Dr. Otellin provided detailed testimony explaining how Claimant's psychiatric condition satisfied the criteria of Listing 12.04C(2), pointing to supporting symptoms and findings. Nevertheless, the ALJ rejected the testimony without considering the factors mandated by regulation, without competing opinions upon which to rely, and without providing a reasonable explanation based upon the evidence of record. (*Id.* at 12-15).

In response, the Commissioner argues that the ALJ was entitled to reject Dr. Otellin's opinions, because they were conclusory and inconsistent with the medical evidence. (ECF No. 17 at 10-19). Moreover, the ALJ provided a long list of reasons, supported by citations to the record, explaining his determination that Dr. Otellin's opinions were unreliable. According to the Commissioner, the evidence substantially supports the ALJ's conclusions; particularly, given that Dr. Otellin routinely found Claimant to have mild psychological symptoms and essentially normal mental status examinations. With respect to the regulatory factors used to weigh treating source opinions, the Commissioner contends that the ALJ must consider them, but is not required to supply a factor-by-factor analysis in the written decision. In the Commissioner's view, the ALJ's decision clearly demonstrates that he considered the factors and provided a reasonable explanation for rejecting Dr. Otellin's opinions.

## V.    **Relevant Evidence**

While the undersigned has reviewed all evidence of record, only the notations most relevant to the disputed issues are summarized below:

### A.  Medical Records

Claimant had his initial visit with Alexander V. Otellin, M.D., a psychiatrist, on April 21, 2011. (Tr. at 471-74, 882-85). Dr. Otellin performed a complete evaluation and intake, beginning with a history. Claimant reported that he was 43 years old and had suffered a heart attack the prior October, requiring stent placement. While he had improved physically, he had not improved mentally. Accordingly, his mother recommended that he see Dr. Otellin. Claimant described having symptoms of depression since his heart attack, which began rapidly and now occurred several times per week. The symptoms included feelings of sadness, difficulty falling asleep, and fatigue. Dr. Otellin estimated the severity of Claimant's symptoms to be moderate. Claimant denied suicidal thoughts, symptoms of mania, or symptoms of psychosis, such as hallucinations or delusions. Claimant admitted to having received psychiatric treatment for depression in the past after the death of his brother. He took Cymbalta for 5 days, but stopped using the medication because of the side effect of urine retention. He did believe that Cymbalta helped his mood, however. Claimant also tried Lexapro, Remeron, Wellbutrin, and Seroquel, but quit taking all of them due to side effects. He currently took Klonopin and Xanax.

When asked about his social history, Claimant stated that he was married and lived with his wife. They had no children. He had a college education and worked as a home health salesman. He had no history of legal problems or violence. Claimant reported a normal childhood, but indicated that his mother had bipolar disorder and his brother had committed suicide in 2008 by jumping off of a bridge.

Dr. Otellin performed a mental status examination, noting that Claimant's muscle strength, tone, gait, and station were all normal. (Tr. at 473, 884). His mood was euthymic

8

with no signs of depression or mania. His speech was normal in rate, volume, and articulation, and his language skills were intact. He had normal thought associations, with logical and appropriate thought content and thinking. Cognitive functioning was intact and age appropriate. Claimant was fully oriented, without signs of anxiety, attention difficulties, or hyperactivity. Dr. Otellin diagnosed Claimant with Bipolar Disorder, Not Otherwise Specified ("NOS"), and Primary Insomnia. Claimant's Global Assessment of Functioning Score was 70.[1] Dr. Otellin started Claimant on Lamictal and Valium and told him to return in four weeks.

Claimant returned to Dr. Otellin's office on June 2, 2011. (Tr. at 433-34, 902-03). Claimant complained of having another heart attack after playing a round of golf. This attack resulted in the placement of three additional stents. The setback caused an exacerbation of Claimant's depression. He felt hopeless and lacked energy, with increased sleeping difficulties. However, Claimant denied symptoms of mania or psychosis. On mental status examination, Claimant appeared attentive and communicative, but was anxious and wary. His speech was normal. His thought content was depressed, as were his facial expressions and general demeanor. Claimant's diagnoses did not change, nor did his GAF score. Dr. Otellin discontinued Lamictal, but continued Claimant on Valium and Neurontin. He was instructed to return in three weeks.

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. A GAF score between 61-70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally indicates that the individual is functioning pretty well and has some meaningful interpersonal relationships. DSM-IV at 32.

Claimant returned twelve days later, stating that he was not doing well and was worse. (Tr. at 439-40, 908-09). All of his depressive symptoms had increased; he felt worthless and was having thoughts of wanting to be dead. Claimant also felt "nervous." On mental status examination, Claimant was calm and fully communicative, but exhibited signs of severe depression; such as, sad demeanor, downcast appearance, tearfulness, and dejected posture. His cognitive functioning and memory were intact, however, and he showed no signs of anxiety, hyperactivity, attention difficulties, psychosis, or mania. His diagnoses remained Bipolar Disorder, NOS, and Primary Insomnia. Dr. Otellin did not change the GAF score either. He did add Luvox to Claimant's medication regimen and instructed him to return in two weeks.

Claimant returned on July 12, 2011. (Tr. at 441-42, 910-11). He reported that he had started the Luvox, and went through "a hell of depression" starting on the second day of taking the drug. He took it for ten more days, but then stopped taking it. Claimant also decreased his Valium intake, which he claimed helped him come "out of a fog." However, he felt extremely depressed thereafter. Some of his relatives told him that Ativan had worked for them, so he took 4 pills the night before and stated that he slept well for the first time. Claimant also reported that his brother gave him some Ritalin pills, which Claimant felt "cleared" his mind and made him more social, stating that he was even "going out for lunch with my friend today." (Tr. at 441, 910). A mental status examination revealed Claimant to be friendly, attentive, and communicative, with moderate signs of depression. He had no signs of psychosis, anxiety, hyperactivity, or attention difficulties. Nevertheless, Dr. Otellin added Attention Deficit Hyperactive Disorder ("ADHD"), Inattentive Type, to Claimant's list of diagnoses and prescribed him Ativan and Ritalin. Dr. Otellin discontinued Valium and Luvox and increased the dosage of Neurontin. He

om

told Claimant to return in three weeks.

On August 3, 2011, Claimant was slightly improved, stating that he "had a good time in Greenbrier last week" and was "ready to go back to work." (Tr. at 445, 919). He reported less depressive symptoms, better sleep, and no symptoms of mania or psychosis. On mental status examination, Claimant was calm, friendly, attentive, communicative, and relaxed. He showed signs of mild depression. His cognitive functioning and memory were intact. He showed no signs of anxiety, hyperactivity, or attentional difficulties. (Tr. at 445-46, 919-20). Claimant's diagnoses were unchanged, and his GAF score remained 70. Claimant's Ativan dosage was decreased, his Neurontin was increased, and Xanax was started. He was told to return in two months.

Claimant returned on September 29, 2011, complaining of a shoulder injury and problems sleeping. (Tr. at 453-54, 935-36). He did feel that Neurontin helped to keep him "on even keel." (Tr. at 453, 935). Claimant continued to have depression, but was tolerating stress better. He felt less sad and was able to think better. On mental status examination, Claimant was calm, attentive, and communicative, but glum. He was wearing a shoulder sling. He had no signs of psychosis. Claimant's cognitive functioning and memory were intact. He showed evidence of mild anxiety, but was not hyperactive and had no attentional difficulties. Claimant had weakness of his left arm and mentioned that he might require surgery on his shoulder. Dr. Otellin talked with Claimant about the dangers of taking medications "in other ways and doses than prescribed. Particularly opiates, benzodiazepines and hypnotics." (Tr. at 454, 936). He discontinued Claimant's Ativan, increased the dosage of Xanax, and started Silenor. Claimant was instructed to return in four weeks.

Claimant's next visit with Dr. Otellin was on October 27, 2011. (Tr. at 457-58, 939-

11

40). Claimant reported that his shoulder had not improved and would require surgery; that his mother-in-law was on life support; and that Silenor was helping him sleep. Claimant appeared slightly improved, with no symptoms of mania, anxiety, or psychosis. He was tolerating stress better, but felt depressed on a daily basis. On mental status examination, Claimant was calm and communicative, but unhappy. His cognitive functioning and memory were intact, and he showed no signs of hyperactivity or attentional difficulties. Claimant's diagnoses remained the same. His GAF score was 70. Dr. Otellin increased his dosages of Neurontin and Xanax and discontinued Ativan. He instructed Claimant to return in four weeks.

On December 1, 2011, Claimant stated that his shoulder pain and family issues were pushing him to the edge. (Tr. at 462-63, 947-48). Dr. Otellin described Claimant as being "unstable" with "no response" to treatment yet. Claimant reported ongoing depression manifesting in daily symptoms of sadness and sleep difficulties. A mental status examination documented Claimant to be calm, attentive, communicative, and "sad looking." (Tr. at 462, 947). He appeared downcast and had a depressed demeanor and facial expression. His cognitive functioning and memory were intact. He had no signs of psychosis, anxiety, hyperactivity, or attentional difficulties. Claimant's diagnoses were Bipolar Disorder, NOS; Primary Insomnia; and ADHD, Inattentive Type. His medications included Neurontin, Ritalin and Xanax. Silenor was discontinued, while Zanaflex and Doxepin were added. Claimant's GAF score was 70.

On January 26, 2012, Claimant reported having "family issues, flu and shingles" to Dr. Otellin. (Tr. at 425, 863). Claimant continued to have depression, but felt he was tolerating stress much better. He still felt sad and had problems sleeping, however. Claimant had no symptoms of mania, or hallucinations, psychotic symptoms, or

constitutional changes. On mental status examination, he was calm, communicative and relaxed. His speech was normal. Claimant appeared to be mildly depressed and his affect was congruent with his mood. He showed no signs of anxiety, hyperactivity, or attentional difficulties. His diagnoses remained the same. Claimant's medications were continued with an increase in his dosage of Neurontin. (Tr. at 426, 864).

On May 2, 2012, Claimant told Dr. Otellin about some health problems he and his mother were experiencing, but indicated that he was slightly improving. (Tr. at 431-32, 891-92). His depression was lessening; he tolerated stress better; and sleep was improving. Claimant continued to have daily anxiety symptoms, however. On mental status examination, Claimant appeared friendly, calm, and relaxed. His speech and speech patterns were normal. He showed mild depression in thought content, mood and affect, but had no evidence of psychosis or suicidal ideations. Claimant's memory was intact, and he exhibited no signs of anxiety, hyperactivity, or attention difficulties. His diagnoses were Bipolar Disorder NOS; Primary Insomnia: and ADHD, Inattentive Type. Claimant's medications were adjusted by discontinuing Xanax and Doxepin and starting Klonopin.

At his next visit on June 14, 2012, Claimant expressed increased anxiety, in part over issues involving his mother's financial matters. (Tr. at 435-36, 906-07). He reported no change in the frequency or intensity of his depressive symptoms, which Dr. Otellin did not feel were responding adequately to treatment. On mental status examination, Claimant was calm and communicative, but looked unhappy. His memory and cognitive functioning were intact. He had no signs of anxiety at the visit, or signs of mania, psychosis, hyperactivity or attention difficulties. His diagnoses were the same, except Intermezzo was started on 6/7/2012. Claimant was asked to return in two weeks.

13

Claimant returned on July 23, 2012. (Tr. at 443-44, 917-18). He reporting having been on vacation and feeling "very good." (Tr. at 443, 917). Then he returned home, and the stress returned. Dr. Otellin noted that Claimant had a slight response to his treatment. He continued to have depressive symptoms, but they had lessened in frequency and intensity. However, he felt more fatigued and had less energy. A mental status examination revealed Claimant to be calm, friendly, and fully communicative. Evidence of moderate depression was present; such as, depressed facial expression and demeanor, listlessness, and anergia. Claimant's cognitive functioning and memory were intact. He had no signs of psychosis, anxiety, hyperactivity, mania, or attentional difficulties. Claimant's diagnoses remained the same, as did his treatment plan, with the addition of Synthroid.

On September 12, 2012, Claimant complained to Dr. Otellin that "I can't believe that massive cloud is still over me." (Tr. at 451, 927). He stated that his grandmother had a major heart attack, then he blew out his shoulder playing golf and needed an arthrography. Claimant indicated that he had been to Costa Rica and had a great time, but then he came back home and "everything started all over again." (*Id.*). He described having increased depression, with symptoms occurring daily and being more intense. Claimant's mental status examination revealed him to be calm and communicative, but unhappy. He appeared downcast and near tears, with a sad demeanor. Claimant had no signs of psychosis, and his cognitive functioning and memory were intact. He also had no signs of anxiety, hyperactivity, or attentional difficulties. Claimant's diagnoses were unchanged. He remained on Neurontin, Ritalin, Zanaflex, Zolpimist, Xanax, Intermezzo, and Synthroid. Dr. Otellin added Oxycodone to the medication regimen and told Claimant to return in four weeks.

Claimant returned on October 11, 2012. (Tr. at 455-56, 937-38). He stated that he might need another surgery on his shoulder, was feeling tired, and was not able to focus well. His symptoms of depression had not changed, although he felt his difficulty concentrating had increased. Claimant reported having symptoms a few times per week. His mental status examination revealed Claimant to be calm, friendly and fully communicative, but he looked unhappy. He showed signs of moderate depression, but no signs of psychosis or anxiety. Claimant's cognitive functioning and memory were intact; he was fully oriented, although his attention span was short. Claimant had no change in diagnoses. Dr. Otellin discontinued Intermezzo and Oxycodone, increased Synthroid and started Claimant on Adderall.

On December 17, 2012, Claimant reported that he had surgery one month earlier. (Tr. at 464-65, 952-53). He also stated that he had tried Adderall and only needed to take 2.5 mg per day. Dr. Otellin noted that Claimant had a slight response to treatment. His depressive symptoms had lessened in frequency or intensity and he was tolerating stress better. He had no symptoms of mania or anxiety and was less sad. Claimant's mental status examination was essentially normal, with no signs of depression or mood elevation, anxiety, hyperactivity, or attentional difficulties. His memory and cognitive functioning were intact. Claimant's diagnoses were the same, and his medications were adjusted by discontinuing Ritalin and decreasing the dosage of Adderall. He was told to return in four weeks.

Claimant next saw Dr. Otellin on January 31, 2013. (Tr. at 427-28, 865-66). Claimant reported "dealing with stress better." (Tr. at 427, 865). His symptoms of depression had also lessened. On mental status examination, Claimant's mood was entirely normal, and he was calm, friendly, fully communicative, and relaxed. His speech,

thoughts, associations, insights, memory, cognitive functioning, and judgment were normal. Claimant had no signs of anxiety, hyperactivity, or attention deficits. The diagnoses remained the same and medications were continued.

When Claimant returned on March 11, 2013, he advised that his grandmother had died and was buried the week prior. (Tr. at 469-70, 878-79). Claimant felt he was improving slowly and was dealing better with stress. Both his anxiety and his depressive symptoms had lessened. On mental status examination, Claimant was calm, friendly, communicative, and relaxed. He displayed signs of mild depression, but was not anxious, hyperactive, or short on attention span. His thoughts, memory, cognitive functioning, judgment, and insight were all normal and intact. Dr. Otellin kept the same diagnoses and medications, except he discontinued Adderall and decreased Xanax. Dr. Otellin again warned Claimant about the dangers of taking medications in ways and doses not prescribed; particularly, hypnotics, opiates, and benzodiazepines. He told Claimant to return in four weeks.

Claimant continued to show improvement at his next visit on April 25, 2013, stating: "finally I am getting better now for a longer stretch of time." (Tr. at 429, 886). Claimant reported having plans to go back to school. He displayed a normal attention span, with no signs of hyperactivity or anxiety. His depressive symptoms were less intense and frequent, occurring a few times per month. On mental status examination, Claimant showed no serious abnormalities. He had no cognitive difficulties; his memory was intact for recent and remote events; he had no anxiety; and he showed no signed of hyperactivity or attentional difficulties. In fact, his attention span was described as normal. Claimant's diagnoses were the same and his medications were continued. (Tr. at 430, 887). He was asked to return in two months.

On June 11, 2013, Claimant reported that his mother-in-law was not doing well after carotid surgery. (Tr. at 437-38, 904-05). His wife was stressed, but he felt that he was handling the stress better than he expected. Claimant also reported less depression, stating the symptoms occurred a few times per month. A mental status examination showed no serious abnormalities. Claimant had neither depression, nor mood elevation. His attention span was normal, and he had no signs of anxiety or hyperactivity. His diagnoses and treatment plan were unchanged. He was told to return in three months.

Claimant returned to Dr. Otellin's office on August 27, 2013, with a significant complication. (Tr. at 448, 924). Claimant's Ritalin was causing hypertension. He was showing slight response to treatment, with less symptoms of anxiety and depression. He had more energy and less anhedonia and sadness, but still had trouble sleeping. Claimant had no significant abnormalities on mental status examination. He showed no signs of depression or mood elevation, no cognitive difficulty, no anxiety, and no memory issues. Claimant's attention span was normal, and he was not hyperactive. Dr. Otellin's diagnoses remained the same, as did his treatment plan with the exception that he discontinued Claimant's prescription of Ritalin.

On November 14, 2013, Claimant indicated that he was referred to pain management for his shoulder. (Tr. at 459-61, 941-43). In addition, his mother-in-law had died, and his wife was not recovering well. Claimant added that he had gone to Key West to scuba dive. He was anticipating that the holidays would be difficult, and he was feeling anxious. Claimant described having ongoing depression, with symptoms several times per week, and he worried excessively. However, he had no manic or psychotic symptoms. He presented on mental status examination as calm and communicative, although he had a sad demeanor, depressed facial expression, and appeared unhappy. Claimant's cognitive

functioning and memory were intact; he was not showing signs of anxiety, hyperactivity, or attentional difficulties. Dr. Otellin's diagnoses did not change, but he adjusted Claimant's medications, discontinuing Zolpimist, increasing Synthroid, and adding Trazodone. Claimant was told to return in two months.

Claimant returned to Dr. Otellin's office on January 9, 2014. (Tr. at 422-24, 857-59). Claimant reported that he was having shoulder pain, which his physician thought would require a shoulder replacement. Claimant continued to have symptoms of anxiety and depression that were unchanged in frequency and intensity. He described excessive worrying and problems with sleeping, although his anergia had decreased. Dr. Otellin performed a mental status examination, finding Claimant to be calm, fully communicative, and well-groomed. However, Claimant appeared unhappy, with a sad demeanor and depressed mood. His speech was normal, and his affect was appropriate and congruent with his mood. He had no indicators of a psychotic process, such as delusions, hallucinations, or bizarre behaviors. His cognitive function was intact; associations were logical and intact, as was his short and long term memory and ability to do mathematical calculations. Claimant did not display signs of anxiety, hyperactivity, or attention difficulties. D. Otellin diagnosed Claimant with Bipolar Disorder, NOS; Primary Insomnia; and ADHD, Inattentive Type, all of which were active. His prescriptions of Neurontin, Zanaflex, Xanax, and Synthroid were continued, and the dosage of Trazadone was increased. Claimant was instructed to return in 6 to 8 weeks.

On February 24, 2014, Claimant indicated that he planned to go on a diving trip in April and was exercising on his bike. (Tr. at 466-68, 873-75). He continued to have anxiety and depression, with excessive worrying and reduced sleep, but no episodes of mania or psychosis. He presented as calm and communicative on mental status examination and

18

looked "happier." (Tr. at 467, 874). He had some signs of mild depression, but was generally within normal limits with no signs of anxiety, hyperactivity, or attentional difficulties. His diagnoses remained and his medications were adjusted with an increase in the Trazadone dosage and resumption of Adderall. Claimant was instructed to return in three months.

Claimant returned on May 22, 2014, reporting that he had been to Belize and his "tooth blew up while [he] was 100 ft. deep." (Tr. at 475, 893). He added that he could not "do many things physically." (*Id.*). Claimant stated that his symptoms of depression and anxiety had not changed. He worried excessively, had increased difficulty sleeping, and experienced depressive symptoms a few times per week. He denied symptoms of mania or psychosis. On mental status examination, Claimant appeared calm, communicative, and happier. He showed signs of mild depression, but his demeaner was relaxed. His memory and cognitive functioning were intact, and he was not hyperactive or having attentional difficulties. His diagnoses were the same; his medications were continued, except for Adderall, which was discontinued; and he was told to return in three months. (Tr. at 476-77, 894-95).

Four months later, on August 21, 2014, Claimant reported that he felt worse. (Tr. at 478, 922). He felt more depressed, with symptoms occurring more frequently and of greater intensity. He was sleeping better, but felt excessively fatigued. His mental status examination revealed intact memory and cognitive functioning; normal thought process and associations; no signs of anxiety, hyperactivity, or attentional difficulties; however, his demeanor was sad and he appeared downcast. He was calm and communicative, but unhappy. Dr. Otellin kept the same diagnoses, but added Fetzima to the medication regimen and instructed Claimant to return in three months. (Tr. at 479, 923).

19

Instead, Claimant returned one month later, on September 22, 2014, complaining of urinary retention related to Fetzima. (Tr. at 480, 932). He still felt depressed and described increased symptoms. Claimant presented as anxious on mental status examination with a sad demeanor and depressed facial expression. However, his cognitive functioning and memory were intact, and his thinking was logical. He was not hyperactive or displaying attention difficulties. Dr. Otellin noted a tremor, discontinued Fetzima, and referred Claimant to a nephrologist. He was asked to return in 8 weeks. (Tr. at 481, 933).

On November 20, 2014, Claimant reported that his mood was better. (Tr. at 483, 944). His cardiologist had adjusted his medication and he was taking Lortab for shoulder pain. He was sleeping better, as well. Claimant denied symptoms of depression, but admitted continued symptoms of anxiety, although they were less intense and less frequent. He specifically denied manic attacks and had no symptoms of psychosis. (Tr. at 483-84, 944-45). On examination, Claimant's mood was euthymic with no signs of depression or mania. He was relaxed, attentive, and communicative. His cognitive functioning and memory were intact; he showed no signs of anxiety, hyperactivity or attentional difficulties. His diagnoses and plan of treatment were unchanged, and he was instructed to return in two months. (Tr. at 484, 945).

Claimant presented on January 19, 2015 with an increase in sleeping problems and a "so-so mood." (Tr. at 486, 860). He reported having depressive symptoms, which Dr. Otellin described as "a setback." (*Id.*). Claimant indicated that his symptoms were more frequent and more intense, manifesting as feelings of sadness. However, he denied feeling hopeless or suicidal. He had no psychotic symptoms. On mental status examination, Claimant was calm, communicative, and attentive, but looked unhappy. (Tr. at 487, 861). His thought content was depressed, but he showed no signs of anxiety. His cognitive

functioning and memory were intact. He was not hyperactive or having attentional difficulties. His diagnoses remained the same. Dr. Otellin gave Claimant a GAF score of 70 and continued his Neurontin, Zanaflex, Xanax, and Synthroid. He increased Claimant's dosage of Trazadone and instructed him to return in 4-6 weeks. (*Id.*).

On February 18, 2015, Claimant complained of depression and high blood pressure, stating that he was contemplating another surgery. (Tr. at 489, 867). He felt his depressive symptoms were worse, with the symptoms occurring a few times per week. He denied manic or psychotic symptoms. Claimant appeared calm, communicative and attentive on mental status examination, although he was unhappy with signs of mild depression. His cognitive functioning and memory were intact; his thought process was normal; he was not anxious, hyperactive, or inattentive. Dr. Otellin found Claimant's diagnoses to be the same. He felt Claimant's medications needed to be adjusted and intended to notify Dr. Patel by letter of the changes. (Tr. at 490, 868).

The following month, on March 6, 2015, Claimant appeared slightly improved. (Tr. at 751-52, 876-77). He stated that his blood pressure had normalized and his shoulder hurt less. His anxiety was less intense, and he had no symptoms of mania or psychosis. On mental status examination, Claimant's mood was euthymic. He appeared relaxed, attentive, and communicative. His cognitive functioning was intact, and he exhibited no signs of anxiety, hyperactivity, or attentional difficulties. Claimant's diagnoses, GAF score, and medications remained the same, with the addition of Ritalin to his medication regimen.

Claimant returned on April 30, 2015 and advised that he was sleepy on Ritalin. (Tr. at 748-50, 888-90). Dr. Otellin felt Claimant was slightly improved, with less frequent and intense anxiety. He had no mania, psychosis, or abnormal neurological findings. On

mental status examination, Claimant's mood was euthymic. He appeared relaxed, attentive, and communicative. His cognitive functioning was intact, and he exhibited no signs of anxiety, hyperactivity, or attentional difficulties. No changes were made to his diagnoses and GAF score. However, his Ritalin was discontinued and Adderall was added to the medication regimen. Claimant was told to return in three months.

On May 28, 2015, Claimant described feeling scared on a recent dive. (Tr. at 745-47, 896-98). He added that he had "bad karma," stating that a rock from a lawn mower flew close to his head. Claimant appeared slightly improved with less frequent and less intense anxiety. He had no mania, psychosis, or abnormal neurological findings. On mental status examination, Claimant's mood was euthymic. He appeared relaxed, attentive, and communicative. His cognitive functioning was intact, and he exhibited no signs of anxiety, hyperactivity, or attentional difficulties. No changes were made to his diagnoses, GAF score, or medications, except his Adderall dosage was increased.

Claimant appeared slightly improved on July 15, 2015. (Tr. at 743-44, 912-13). His anxiety symptoms were less frequent and intense, although his medication was causing some sleepiness. He had no mania, psychosis, or abnormal neurological symptoms. On mental status examination, Claimant was euthymic, without signs of depression. He appeared relaxed, attentive, and communicative. His cognitive functioning was intact, and he exhibited no signs of anxiety, hyperactivity, or attentional difficulties. No changes were made to his diagnoses, GAF score, or medications.

Claimant returned to Dr. Otellin's office on September 14, 2015. (Tr. at 740-42, 929-31). Claimant stated that he had an MRI to investigate headaches, which had revealed a nodule on his thyroid gland. Claimant was depressed and reported having more frequent and more intense symptoms, occurring approximately a few times per week. He

described feelings of worthlessness. Claimant denied symptoms of mania or psychosis. His mental status examination revealed him to be friendly and communicative, but depressed. His cognitive functioning and memory were intact, and he displayed no signs of anxiety, hyperactivity, or attentional difficulties. His diagnoses and treatment were unchanged.

Claimant presented to Jami Prasuna, M.D., an endocrinologist, on September 29, 2015. (Tr. at 657-69). Claimant complained that he had severe anxiety and kept repeating that he was also severely fatigued and no one could find out the cause of his fatigue. Claimant stated that he was found to have a nodule on his thyroid incidental to a CT scan that was taken after he suffered a concussion. A review of systems was negative except for the complaints stated. Claimant explicitly denied depression, irritability, or a high stress level. On examination, Claimant was in no acute distress and appeared pleasant. The thyroid nodule was palpated and was thought to be about 1 centimeter in size. Dr. Prasuna felt the nodule needed to be aspirated to determine if it was cancerous. He also ordered some blood work to determine if Claimant's fatigue was related to his thyroid.

On October 9 and 30, 2015, Claimant was examined by Dr. Ziad Kahwash, an endocrinologist, who was evaluating the nodule found on Claimant's thyroid. (Tr. at 612-27). In a review of systems, Claimant stated that he had anxiety, depression, memory difficulties, tremors, loss of balance, and difficulty concentrating. (Tr. at 612-13, 622-23). On examination, Claimant was neurologically intact—both his gross orientation and reflexes. (Tr. at 614, 624). Dr. Kahwash felt the nodule on Claimant thyroid was suspicious for cancer; therefore, he referred Claimant for surgical evaluation. (Tr. at 614).

On November 18, 2015, Claimant saw Dr. Michael Boustany for a surgical consultation. (Tr. at 685-87). By way of history, Dr. Boustany documented that Claimant

slipped and fell on a hardwood floor, hitting his head. He was taken to Charleston Area Medical Center where he was examined and ultimately treated for a concussion. A CT scan was performed that showed, as an incidental finding, nodules on Claimant's thyroid gland. Claimant was seen by Dr. Prasuna, who evaluated Claimant and sent him to Dr. Kahwash. Dr. Kahwash ordered some diagnostic tests that were abnormal, so Claimant was referred for a surgical consultation. Claimant also complained of fatigue, weight loss, weakness, hoarseness, and depression. On examination, Claimant appeared well and was in no acute distress. The thyroid nodule was palpable. Based upon the diagnostic studies provided to Dr. Boustany, he believed the nodule was suspicious for papillary carcinoma. He recommended a right thyroidectomy, possibly a total thyroidectomy. Dr. Boustany discussed the procedure and risks with Claimant, who consented to the procedure. The surgery was performed on November 24, 2015, without complication. (Tr. at 689-90). Dr. Boustany ended up performing a total thyroidectomy and found cancer in both lobes of the thyroid gland. (Tr. at 691). Claimant saw Dr. Boustany three times post-operatively: December 2, 2015; December 11, 2015; January 6, 2016, On each occasion, Dr. Boustany noted that Claimant was doing well post-total thyroidectomy. (Tr. at 679, 681, 683). He appeared healthy, alert, and in no acute distress, with good wound healing.

On December 7, 2015, Claimant saw Dr. Otellin. (Tr. at 737-39, 949-51). Claimant stated that he had undergone a total thyroidectomy due to cancerous nodules, which left him feeling weak and tired. Dr. Otellin noted that Claimant had chronically-present depression with little change in the frequency or intensity of his symptoms. He also felt excessively tired, felt cold, and had lost weight. Claimant had no psychotic symptoms, but showed signs of anxiety and unhappiness. His cognitive functioning and memory were intact. He was not hyperactive or having attentional difficulties. There were no changes

24

in his diagnoses or plan of treatment.

Claimant returned to Dr. Otellin's office on February 18, 2016 complaining that he had no energy and was going to start taking a higher dose of Synthroid. (Tr. at 734-36, 870-71). His depressive symptoms had not changed, but he felt less energetic. He had also experienced weight loss and felt cold. On mental status examination, Claimant appeared wary and unhappy, but was communicative. He was hoarse after thyroid surgery. His demeanor was sad and he seemed listless and anergic. Claimant had no psychotic symptoms. His cognitive functioning and memory were intact. He showed signs of anxiety, but no signs of hyperactivity or attentional difficulties. His diagnoses, medications, and GAF score were unchanged. Dr. Otellin instructed Claimant to return in two months.

On April 7, 2016, Claimant saw Dr. Otellin in follow-up. (Tr. at 732-33, 880-81). His medications were continued; his diagnoses were the same; and his GAF score was 70. He was asked to return in three months.

Claimant returned to Dr. Otellin's office on June 1, 2016. (Tr. at 899-901). He complained of still having no energy. His depressive symptoms were chronically present and about the same in frequency and intensity. On mental status examination, Claimant presented as wary and unhappy, but communicative, cooperative and attentive. He appeared moderately depressed, with a sad demeanor and listlessness. However, Claimant was fully oriented, with cognitive functioning and memory intact. He showed signs of anxiety, but had no evidence of hyperactivity, attentional difficulties, or psychosis. Dr. Otellin's diagnoses remained Bipolar Disorder, NOS; Primary Insomnia; and ADHD, Inattentive Type. Claimant's GAF score was still 70. His medications were continued.

On July 18, 2016, Claimant advised Dr. Otellin that he was losing weight and had tingling in his fingers. (Tr. at 914). Claimant's depression was unchanged and he continued to have excessive fatigue. On mental status examination, Claimant was wary, but communicative, attentive, and cooperative. He looked unhappy, with a sad demeanor and listlessness. His cognitive functioning and memory were intact. He showed no signs hyperactivity, attentional difficulties, psychosis, or gross behavioral abnormalities, but he was anxious. His diagnoses, medications, and GAF score were unchanged.

### B. Evaluations and Opinions

Dr. K. K. Challa, M.D., Claimant's cardiologist, sent a letter to Dr. Otellin on July 13, 2011, notifying him that Claimant had been having some chest tightness recently, although a stress test was negative. (Tr. at 363) Dr. Challa wrote that in view of Claimant's age, cardiac history and issues, and his psychiatric problems, Dr. Challa "tend[ed] to agree that [Claimant] needs to find a job which would not be very stressful to him." (*Id.*). Dr. Challa indicated that he had discussed his opinion with Claimant.

On May 20, 2014, Claimant was evaluated by Kay Collins-Ballina, M.A., and Nina Lusk, M.A. at the request of the SSA. (Tr. at 335-38). The evaluators observed that Claimant arrived unaccompanied and twenty minutes early for his appointment. He reported living with his wife in Charleston, West Virginia and stated that he was applying for disability benefits due to having nine stents placed in his coronary vessels, two shoulder surgeries related to a fall in 2010, and mental instability that began in 2008 after his brother committed suicide by jumping off the Dunbar Bridge.

Claimant described himself as "a hermit," indicating that he was unable to do as much physically as he had in the past, like playing golf and softball, which had led to his friends no longer contacting him. Claimant described having trouble sleeping, which was

exacerbated by him having a major heart attack. He also began having nightmares, which increased after his mother's death in 2012. Claimant stated that some of his dreams involved his mother-in-law, who died after being in a coma for a month.

Claimant denied having suicidal thoughts at present and denied a history of suicide attempts, but did admit to prior suicidal ideations without a plan. He received sporadic mental health care in the distant past and began seeing Dr. Alexander Otellin more regularly in 2008. He recalled one mental health hospitalization, which occurred when he was in college, but he could not recall the name of the hospital or the circumstances that led to his admission.

With respect to his health history, Claimant stated he had a normal childhood. In 2012, he suffered a massive heart attack that required the implantation of nine stents. He also fell that year and injured his shoulder, resulting in two surgeries to reattach his bicep tendon. Claimant received physical therapy and pain medication, but became dependent on the medication. At present, he took only Aleve for pain. Claimant described his daily activities as arising at various times in the morning, performing self-care independently, talking to friends on the phone occasionally, and sometimes going out of the house. He stated that if he went out three days in one week, that was a "good" week. (Tr. at 337).

The evaluators performed a mental status examination of Claimant. Claimant appeared tanned and neatly dressed. His speech was relevant, coherent, and of normal rate and volume. He was oriented times four. His mood was mildly dysphoric; his affect was broad; but his stream of thought was logical, and he had no hallucinations. Claimant's psychomotor activity, insight, memory, attention, concentration, persistence, and pace were all normal. (*Id.*).

The evaluators assessed Claimant with Depressive Disorder, not otherwise

specified, noting that he did not meet the full criteria for a specific mood disorder. (Tr. at 338). They felt that Claimant's symptoms might be alleviated with psychotropic medication and believed that his prognosis was good with treatment and intervention. Claimant appeared capable of managing any benefits he might receive and displayed normal social functioning during the evaluation.

On May 31, 2014, Claimant was evaluated by Zachary C. Cohen, M.D., primarily for assessment of his physical impairments. (Tr. at 340-45). However, during the examination, Dr. Cohen documented that Claimant reported a history of mental health problems beginning in 2008 secondary to medical and family problems. (Tr. at 340). Claimant described difficulty sleeping, difficulty concentrating, and changes to his appetite. He denied manic episodes and suicidal thoughts. He was currently taking medication and attending counseling, but felt that his mental health affected his ability to function, primarily because it interfered with his concentration. (Tr. at 341). Claimant advised that he was unemployed and spent most of the day watching television and resting. He was married and had no children. On examination, Claimant was alert and had good eye contact. His speech was fluent; his mood was appropriate; and he had clear thought processes. Dr. Cohen assessed Claimant's memory as normal and his concentration as "good." (Tr. at 343).

On June 24, 2014, Rosemary L. Smith, Psy.D., completed a Psychiatric Review Technique based upon her review of Claimant's disability file. (Tr. at 90). Dr. Smith found evidence of an organic mental disorder under Listing 12.02, which did not precisely fit the criteria of the Listing, and evidence of an Affective Disorder under Listing 12.04 that also did not precisely fit the listing criteria. Looking at the four broad functional categories under paragraph B, Dr. Smith opined that Claimant had mild limitations in activities of

28

daily living, social functioning, and maintaining persistence, pace, and concentration. She found no evidence that Claimant had experienced episodes of decompensation, each of extended duration. (*Id.*). Dr. Smith opined that the evidence did not establish the presence of paragraph C criteria. When asked for an additional explanation of her findings, Dr. Smith relied upon Claimant's activities of daily living, Dr. Otellin's medical records, and the results of the consultative psychological evaluation, all of which she felt substantiated that Claimant did not have significant functional limitations related to a mental impairment. (*Id.*). This opinion was affirmed after a case review by Joseph Richard, clinical psychologist, on November 17, 2014. (Tr. at 103-04).

On December 10, 2014, Dr. Otellin completed a Mental Impairment Questionnaire-Adult. (Tr. at 492-501). Dr. Otellin stated that he had seen Claimant monthly, on average, since April 2011. Claimant was diagnosed with Bipolar Disorder, NOS; Generalized Anxiety Disorder; and Primary Insomnia. According to Dr. Otellin, Claimant had a GAF score between 65-70 currently, with his highest score in the past year being 60.[2] As for Claimant's treatment and response, Dr. Otellin indicated that Claimant had a partial response in that he coped with stress better, but was still not coping well enough to keep up with the daily stressors at work. Dr. Otellin added that Claimant had strong anxiety responses to changes in his health and routine; therefore, the prognosis for Claimant to return to his prior work, or to a similar job, was unfavorable. (Tr. at 493). Dr. Otellin felt that Claimant's psychiatric condition exacerbated his physical pain and symptoms by decreasing his pain threshold, increasing pain symptoms, and making it more difficult for Claimant to cope with pain. On a checklist asking for Claimant's

---

[2] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

symptoms and signs, Dr. Otellin marked anhedonia; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); easy distractibility; and sleep disturbance. (Tr. at 494). When asked about functional limitations, Dr. Otellin marked that Claimant had none to mild limitations of activities of daily living; moderate difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation within a 12-month period, each of at least two months duration. (Tr. at 496). "Episodes of decompensation were defined as "exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation of symptoms that would ordinarily require increased treatment or less stressful situation (or a combination of the two)." Dr. Otellin was asked to provide the dates of any such episodes of decompensation, and he listed: January 2014, February 2014, August 2014, and September 2014. Dr. Otellin also opined that Claimant had a mentally documented history of chronic organic mental, schizophrenic, ect., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of his ability to do basic work activity, with symptoms or signs currently attenuated by medication or psychological support and with three or more episodes of decompensation within 12 months, each lasting longer than two weeks. (Tr. at 497). He felt that Claimant's psychological issues would cause him to miss more than four days of work per month and his impairment would last more than twelve months.

On a function-by-function basis, Dr. Otellin opined that Claimant was not significantly limited in his ability to: understand, remember, and carry out very short and simple instructions; perform activities within a schedule; be punctual and maintain regular attendance; and interact appropriately with the general public. (Tr. at 498-500). Claimant was moderately limited in his ability to: understand, remember, and carry out very long and detailed instructions; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the workplace; travel in unfamiliar places and use public transportation. He was markedly limited in his ability to: maintain attention and concentration for extended periods; work in coordination with and proximity to others without being distracted by them; and get along with coworkers and peers with distracting them or exhibiting behavioral extremes. However, Dr. Otellin did not believe Claimant had any limitations in his ability to: remember locations and work-like procedures; make simple work-related decisions; ask simple questions and request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; be aware of hazards and take appropriate precautions; and set realistic goals and make plans independently of others. (*Id.*). Dr. Otellin did not provide any additional reasons for why Claimant would have difficulty working at a regular job on a sustained basis. (Tr. at 500). However, he opined that Claimant was not capable of working 8 hours per day, 5 days per week. (Tr. at 501).

### C.  Statements and Testimony at Administrative Hearing

Claimant completed an Adult Function Report on February 16, 2014. (Tr. at 209-

16). He indicated that he had sleep derivation from pain, as well as depression. Claimant could perform daily personal activities with some difficulty, but could not do household chores or yardwork. He went out of the house two times per week, and could drive or ride in a car. Claimant previously played sports, but could no longer participate in them, although he still watched sports on television. He spoke on the telephone daily. He got along with family, friends, and neighbors, but had severely decreased his social activities. Claimant stated that he could pay attention for 20-30 minutes and could follow written and oral instructions. He did not handle stress or changes in routine well, but had no difficulties with authority figures.

In an Adult Function Report prepared by Claimant on September 4, 2014, he complained that sleep deprivation from shoulder pain and depression continued to inhibit his mental faculties. (Tr. at 235-42). He was still able to do his daily personal care, although the tasks took longer to complete, and his arm impairment prevented him from doing household chores and yardwork. He continued to go outside twice per week on average and was able to ride in and drive a car. Claimant liked to watch television and spoke daily on the telephone, but did not go anywhere on a regular basis. He did not have problems getting along with family, friends, or neighbors, although his depression lessened his interactions with them. Claimant's attention span remained 20 to 30 minutes, and he could follow written and spoken instructions. He got along "fine" with authority figures, but stress and changes in routine were still difficult for him to manage.

At the administrative hearing, Claimant testified that he graduated from the University of Charleston with a degree in environmental science. (Tr. at 60). He last worked as an account executive in pharmaceutical sales for a healthcare services company. Claimant stated that his health problems made it difficult for him to function,

and his lack of functionality made him depressed. (Tr. at 62-63). He complained of feeling tired, yet having difficulty sleeping, leading to problems with concentration. (Tr. at 64-65). Claimant testified that he misplaced items, would forget why he entered a room, and would mistakenly take his medication twice if his wife did not put it away for him. (Tr. at 65). Claimant indicated that he could do very little around the house due to physical discomfort and fatigue, and his lack of physical ability was emotionally difficult for him to accept. (Tr. at 70).

Dr. Otellin also testified at the administrative hearing. (Tr. at 57-59). He stated that he began treating Claimant in April 2011 for bipolar disorder and primary insomnia. Later, ADHD, inattentive type, was added to the list of Claimant's diagnoses. Dr. Otellin testified that Claimant had longstanding problems with concentration, which became more prominent after his heart attack and other health problems surfaced. In addition, Claimant began to suffer depression associated with his frequent health issues. Dr. Otellin felt that Claimant's medical conditions—such as, his thyroid disorder—significantly contributed to his depression and were likely to result in Claimant missing as many as four days of work each month. Claimant's counsel read the criteria of Listing 12.04C(2) to Dr. Otellin and asked him if Claimant met the criteria. Dr. Otellin answered in the affirmative, basing his answers on Claimant's concentration deficits and likelihood of missing work.

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  **Discussion**

Claimant raises two interrelated challenges to the Commissioner's decision. He argues that the ALJ did not give proper weight to the opinions of Dr. Otellin, Claimant's treating psychiatrist; particularly, his opinion that Claimant met Listing 12.04C(2). Claimant contends that the ALJ did not evaluate this opinion in the manner required by Social Security regulations, because he failed to give proper deference to Dr. Otellin's position as a treating medical source, failed to consider all of the factors pertinent to assigning weight to a medical source opinion, failed to acknowledge the absence of competing opinions, and failed to provide a logical, evidence-based explanation for rejecting the opinion. Claimant adds that, because the ALJ's analysis of Dr. Otellin's opinion was faulty, the ALJ's finding that Claimant did not meet the criteria of Listing 12.04C(2) was not supported by substantial evidence and, thus, requires remand.

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525(a). The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; therefore, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). However, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing involves Mental Disorders, which in September 2016 were arranged in nine diagnostic categories, including Listing 12.04, pertaining to Affective Disorders. To trigger review under Listing 12.04, a claimant is first required to produce medical evidence establishing the presence of an affective disorder, which is a mental state "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 ¶ 12.04. To meet or equal Listing 12.04, the claimant must then demonstrate that he satisfies the severity criteria of paragraphs A and B, or alternatively, that he satisfies the criteria of paragraph C. *Id.* Under paragraph C, the claimant must show a "[m]edically documented history of a chronic affective disorder of at least 2 years'

35

duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated (reduced or weakened) by medication or psychosocial support" **and** that at least one out of three additional criteria is present. The second criterion, which Claimant purports to satisfy, requires evidence of "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." *Id.* at ¶ 12.04C(2).

In this case, the ALJ considered whether Claimant met the criteria of Listing 12.04C, noting that the evidence, in general, failed to establish the presence of paragraph "C" criteria. Specifically with respect to Listing 12.04C(2), the ALJ found nothing in the record to suggest that Claimant would decompensate with a minimal increase in mental demands or change of environment; by way of example, the ALJ pointed to Claimant's ability to take vacations, drive, and travel in vehicles—all demanding activities—without decompensating. (Tr. at 37-38). In further support, the ALJ also noted that Claimant had no more than moderate restrictions in the four broad functional categories of paragraph B; had normal mental status examinations; had never required psychiatric hospitalization or a highly supportive living arrangement; and had not previously suffered any episodes of decompensation of extended duration. (*Id.*).

The ALJ also considered Dr. Otellin's opinion that Claimant met Listing 12.04C(2). The ALJ began his analysis by reviewing Dr. Otellin's clinical notations, which provided a longitudinal record of Claimant's complaints, recorded contemporaneously with findings on mental status examination. The ALJ remarked that Claimant began treatment in 2011 with complaints of worsening depression and sleep difficulty. However, he showed no signs of mania, delusions, hyperactivity, anxiety, or attention deficits.

36

Claimant's insight and judgment were intact. His symptoms began to decrease with treatment, and only increased when he was concerned about the health of a family member. (Tr. at 42). The ALJ indicated that Claimant's symptoms declined during the years of 2013 and early 2014. Although he continued to feel depressed, his symptoms were less frequent and less intense, and he tolerated stress better. Claimant took several vacations. Throughout this period, his mental status examinations were essentially normal. Claimant was evaluated during this time frame by an SSA consultant, who made findings similar to those of Dr. Otellin. The consultant observed Claimant to be mildly dysphoric, but had normal psychomotor activity, judgment, insight, memory, concentration, persistence, pace, and social functioning. (*Id.*).

After reviewing the treatment notes, the ALJ commented on some inconsistencies in the record. Specifically, he discussed Dr. Otellin's statement that Claimant's depression was "treatment resistant." (Tr. at 42). The ALJ found this statement to be curious in light of the treatment records, which assessed Claimant's most recent level of depression as "mild," a degree less severe than the "moderate" level of depression present at Claimant's initial appointment. In addition, the ALJ found Dr. Otellin's diagnosis of concentration difficulties to be contradictory to his clinical notations, in which he consistently documented that Claimant had no difficulties with attention or memory. (*Id.*).

The ALJ directly addressed Dr. Otellin's residual functional assessment and his opinion that Claimant met Listing 12.04C(2). The ALJ explained that he gave little weight to these opinions, because they were inconsistent with Dr. Otellin's treatment records. The ALJ reiterated that Claimant's mental status examinations, as recorded by Dr. Otellin on numerous occasions, were essentially normal, except for mild to moderate signs of depression. Claimant had no hallucinations, delusions, bizarre behaviors, or evidence of

37

psychosis. His thoughts were logical, and his insight and judgment were normal. While he had signs of anxiety, Claimant was cooperative, with no evidence of hyperactivity or attentional difficulties. Therefore, Dr. Otellin's opinions simply did not match his clinical records. In contrast, Dr. Otellin's clinical records were absolutely consistent with the findings and opinions of the examining SSA consultants and non-examining sources who had completed Psychiatric Review Techniques. These experts found no evidence of paragraph C criteria and no marked limitations of function.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to

controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[3] and must explain the reasons for the weight given to the opinions.[4] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected … In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[4] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the … factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the … factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Here, the ALJ performed a proper evaluation of the medical source statements, both in determining whether Claimant met Listing 12.04C(2) and in assessing his residual functional capacity. As Claimant concedes, the determination of whether Claimant met a listed impairment was an administrative function reserved to the Commissioner. As such, no treating source opinion was entitled to special weight or significance. The ALJ was required only to consider Dr. Otellin's opinion on that point, which the ALJ clearly did. The ALJ rejected the opinion, because it was not consistent with the weight of the evidence, and the ALJ provided good reasons for that conclusion. He explained on several occasions that Claimant had not had any episodes of "decompensation" as that term is generally understood in the Social Security regulations. The ALJ noted that Claimant had never required a significant alteration in medication or shown a need for more structured psychological support, such as hospitalization or placement in a halfway house. Moreover, the evidence did not demonstrate any tendency on Claimant's part to decompensate when faced with minimal changes in the environment, or an increase in mental demands. As evidence of this conclusion, the ALJ pointed to Claimant's ability to cope with demanding situations, such as driving and traveling in automobiles, and with significant environmental changes, such as traveling to Costa Rica, Key West, Myrtle Beach, and Belize. Despite the stressors associated with interstate and overseas travel, Claimant's mental status examinations were essentially normal throughout his treatment experience with Dr. Otellin. In fact, his depression actually decreased over time.

The undersigned **FINDS** the ALJ's step three determination to be supported by substantial evidence. As the ALJ emphasizes, Claimant simply does not have the severity of symptoms necessary to meet a listing. While he does have chronic depression and periodic stress, usually related to or caused by medical concerns, his mental status

41

examinations were otherwise normal. Claimant never required psychiatric hospitalization. Dr. Otellin routinely tinkered with Claimant's medications, but never made a significant alteration that corresponded to a major change in Claimant's behavior. Furthermore, Dr. Otellin's opinion was the only evidence in the record to suggest that Claimant had disabling functional limitations, and the ALJ found Dr. Otellin's opinion to be unsupported and inconsistent with other persuasive evidence, not the least of which was Dr. Otellin's own treatment records.

Furthermore, the ALJ's interpretation of the record is a sound one. Claimant undoubtedly suffered from depression and anxiety that were exacerbated by his health concerns and the significant life changes that he experienced during his treatment with Dr. Otellin. However, there is no evidence in the record upon which one could reasonably predict that "even a minimal" increase in mental demands or change in environment would cause Claimant to decompensate. To the contrary, the record shows that even when faced with highly stressful circumstances, Claimant did not require significant alteration in his medications or the need for a more structured psychological support system. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 ¶ 12.00C4. According to the record, in June 2012, Claimant was experiencing increased stress over his mother's financial matters; however, his depressive symptoms remained the same, and he had no changes on mental status examination other than he looked unhappy. (Tr. at 435-36). In September 2012, he reported that his grandmother had suffered a massive heart attack, he had reinjured his shoulder playing golf, and he had traveled to Costa Rica—all of which were highly stressful, mentally demanding, or environment-changing events—yet his diagnoses and treatment regimen remained exactly the same. (Tr. at 451). In March 2013, Claimant reported that his grandmother had died, but nonetheless, he felt that he was slowly

improving. (Tr. at 469-70). His mother-in-law was quite ill by June 2013, and Claimant stated that he was handling the stress better than he expected. (Tr. at 437-38). In November 2013, Claimant reported that his mother-in-law had recently died and his wife was still grieving; Claimant had traveled to Key West. (Tr. at 459-61). Although he was anxious about the upcoming holidays, he showed no major changes on mental status examination and was continued on essentially the same treatment course. Claimant traveled to Belize in May 2014 and went scuba diving. (Tr. at 475). He displayed signs of mild depression on his return, but his mental status examination was otherwise normal. His treatment course and diagnoses were the same. Once again, despite significant environmental changes, which he voluntarily endured, the record shows no evidence that Claimant experienced mental health decompensation. Claimant was still scuba diving in 2015 and was described as "slightly improved" with less frequent and less intense anxiety. (Tr. at 745-47). Even after his diagnosis and treatment for cancer, Claimant's psychiatric diagnoses, medications, and mental status examinations remained stable. (Tr. at 732-39, 899-901, 914). Consequently, as the ALJ indicated, nothing in the record provides a basis upon which to predict that even a *minimal* change in environment or increase in mental demands would cause Claimant to decompensate.

In addition, the undersigned **FINDS** that the ALJ's rejection or discounting of Dr. Otellin's opinions was likewise supported by substantial evidence. Contrary to Claimant's contention, the ALJ plainly considered the relevant factors in weighing Dr. Otellin's opinions. He acknowledged that Dr. Otellin was Claimant's treating psychiatrist and had seen Claimant since 2011; thus, considering the length of the relationship and Dr. Otellin's specialty. (Tr. at 35, 37, 42, 44). The ALJ also reviewed Dr. Otellin's records in detail; thereby, assessing the frequency and nature of the treatment relationship. The ALJ then

spent a considerable amount of time evaluating the supportability and consistency of Dr. Otellin's clinical notes by comparing and contrasting them with Dr. Otellin's statements, Claimant's activities, and the findings of other examiners and non-examining consultants. The ALJ was struck by obvious contradictions between Dr. Otellin's contemporaneous clinical notes, which documented relatively benign psychological findings, and his subsequent RFC assessments, which included significant limitations, some of which had no apparent factual basis in the clinical record. Indeed, as the ALJ emphasized, Dr. Otellin diagnosed Claimant with ADHD, inattentive type, and found him to have marked limitations in his ability to maintain attention and concentration, despite the fact that Claimant rarely showed any signs of attentional difficulties at his appointments with Dr. Otellin.

For these reasons, the undersigned **FINDS** that the ALJ did not err in his step three finding that Claimant failed to meet or equal Listing 12.04C and did not err in his assessment of Dr. Otellin's medical source opinions or the weight given to the opinions.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 17); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section

636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** August 24, 2018

Cheryl A. Eifert
United States Magistrate Judge

45